CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

5/20/2020

JULIA C. DUDLEY, CLERK
BY: s/ J. Vasquez
        DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## HARRISONBURG DIVISION

| | | |
|---|---|---|
| EDWARD KOVARI, | ) | |
| Plaintiff, | ) | Civil Action No. 5:18cv0070 |
| | ) | |
| v. | ) | |
| | ) | By: Michael F. Urbanski |
| BREVARD EXTRADITIONS, LLC, | ) | Chief United States District Judge |
| et al., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This matter is before the court on objections filed by defendant Brevard Extraditions, LLC, Prisoner Transportation Services of America, LLC, and Prisoner Transportation Services, LLC's (collectively "Brevard") Motion to Exclude Dr. Susi Vasallo, ECF No. 174; Brevard's Motion for Summary Judgment, ECF No. 175; Brevard's Motion to Exclude Trial Testimony of Eric L. Clark, ECF No. 179; and Plaintiff Edward Kovari's Motion to Exclude Testimony of Charles Hildebrand, ECF No. 182. The matters have been fully briefed, the court heard argument on all pending motions on March 10, 2020. The matters are ripe for resolution.

After a thorough review of the applicable law and substantial materials filed in this case, the court **DENIES** Brevard's motion for summary judgment as to all claims except for intentional infliction of emotional harm and declaratory relief, which the court **GRANTS**. The court **DENIES** Brevard's motion to exclude Dr. Susi Vasallo. The court further **GRANTS in part** and **DENIES in part** Brevard's motion to exclude the testimony of Eric

L. Clark and Kovari's motion to exclude the testimony of Charles Hildebrand, and strictly confines the scope of their testimony as outlined herein.

## I.   BACKGROUND

This case encompasses several constitutional and state tort law claims brought by Kovari against the two private prisoner transport companies hired for his extradition, their parent holding company, and six John Doe defendants representing the drivers involved in the transport, challenging the allegedly "extreme and inhumane conditions" of his multi-day transport from Virginia to Texas. Compl., ECF No. 1, at 1.

## A.   FACTUAL SUMMARY

Kovari alleges physical and emotional injuries arising out of his seventeen (17) day transport from Winchester, Virginia to Houston, Texas for the prosecution of a false theft charge that was ultimately dismissed. Def. Mot. Sum. J., ECF No. 177, at 2; Pl. Opp. Mot., ECF No. 193, at 4. Kovari was arrested on September 2, 2016 outside of a Sheetz gas station and ultimately extradited to Houston, Texas where he faced outstanding charges for the theft of a vehicle. Frederick County General District Court Records, ECF No. 177-1. Until the time of his transport, September 12, Kovari was booked in Northwestern Regional Adult Detention Center ("Northwestern Regional"). Northwestern Regional Records, ECF No. 177-3.

There, Northwestern Regional staff completed a Booking Report for Kovari as a part of their routine intake process. Business Record Declaration, ECF No. 194-5, at 2-3. This form is completed for all inmates and is a prerequisite to seeing a medical professional at the facility. Id. Kovari stated that he told staff that he had been diagnosed with hypertension, was pre-diabetic, was morbidly obese at over 400 pounds, that he had a history of hospitalization

2

for heart issues, and that he takes prescription medication for his hypertension. Kovari Dep., ECF No. 194-2, at 127:22-128:21, 134:18-135:2; see also Winchester Medical Center Records, ECF No. 194-6 (confirming the aforementioned diagnoses, indicating medication for hypertension was prescribed, chronicling hospitalizations for cardiac issues). The completed form records his age, relevant medical history such as prior treatment for substance abuse, a history of heart disease or hypertension, his status as a pre-diabetic, and the identification of "other medical/dental problems." ECF No. 193-5, at 2-3. The form reflects that Kovari was "Referred to Medical" based on his responses. Id. Brevard does not acknowledge the content of this form, alleging that "[t]here are no records from Northwestern Regional indicating Plaintiff ever requested or received any medication or medical care while in custody there." ECF No. 177, at 4.

Next, Nurse Johnny Tillman, a member of the medical staff at Northwest Regional, completed an Admission Screening form that was intended to record underlying medical conditions or concerns an inmate articulates during processing. Northwestern Regional Admission Form, ECF No. 177-3. No underlying medical conditions were recorded on this form. The parties dispute the extent to which the form Tillman completed accurately reflected the information Kovari provided during his medical interview. Brevard alleges that Kovari denied having any underlying medical condition or taking any prescription medications. ECF No. 177, at 3. Kovari contends he reiterated the same information to Tillman that he had told Northwestern Regional staff during his booking. Kovari Dep., ECF No. 194-2, at 134:1-135:10. Tillman recorded Kovari's weight as 463 and his blood pressure as 168/92, Admission Form, ECF No. 194-7, which is elevated. ECF No. 193, at 2; see also Tillman Dep., ECF No.

3

194-8 (admitting the blood pressure is elevated), Vassallo Report, ECF No. 194-9, at 5. Kovari claims he took medication for his hypertension for the duration of his time at Northwestern Regional, approximately eight (8) days.  Kovari Dep., ECF No. 194-2, at 80:20-81:5, 131:13-132:15, 135:11-14; Prisoner Transportation of America Receipt, ECF No. 194-11 (checking the box that Kovari was picked up with medication and property); Caruso Dep., ECF No. 194-12, at 90:11-13. Brevard denies that Kovari received medical attention or medication. ECF No. 177, at 4.

Harris County hired Brevard,[1] a private extradition company, to transport Kovari from Winchester, Virginia to Houston, Texas. Harris County Contract, ECF No. 194-14.   On September 12, 2016, Kovari was picked up by Brevard employees Mark Nahrstedt and Pedro Cuneo from Northwestern Regional. Trip Log, ECF No. 177-5. Pursuant to their standard pick up process, Nahrstedt filled out a Prisoner Medical Information document, which does not reflect any information about Kovari's alleged underlying medical conditions existing at the time of transport; however, it does reflect that Kovari had been hospitalized for heart monitoring months earlier and that he was picked up with medication. Prisoner Medical Information, ECF No. 177-7.   Brevard claims that Kovari denied having any medical conditions. ECF No. 177, at 4. Kovari claims that he did communicate his hypertension, hospitalizations, and need for medication, but that the information was not recorded and that he was not given an opportunity to review the form before being asked to sign it. Kovari Dep. ECF No. 194-2, at 70:6-72:7. The parties dispute whether Cuneo and Narhstedt received the

---

[1] Harris County hired PTS of America, LLC to execute the extradition. For the purposes of this case, all three defendants are being treated as a single entity.

required Medical Authorization for Transport form when they picked up Kovari at Northwest Regional, but Brevard admits they have been unable to locate any such form despite claiming they did receive it. Def. Resp. to RFA, ECF No. 194-21.

That same day, the van suffered a tire blowout and damage to the van's cooling system, which caused the transport to halt on the side of the road for a few hours while the issue was addressed. ECF No. 177 at 4. Kovari recalls that it was a hot day, over 80 degrees, and that passengers were not permitted to leave the van while the issue was resolved. ECF No. 193, at 16. During this incident, local officers arrived at the scene to offer help, during which time passengers were permitted to exit the vehicle and use the restroom. Id. Kovari claims that drivers only permitted this at the behest of the local officers, but at the March hearing, Brevard said that the hesitation to allow passengers out of the van was born out of security concerns.

The parties dispute the specific route taken during the course of Kovari's transport, but agree that the total trip took 17 days, including about 120 hours of driving time. ECF 177, at 2; ECF 193, at 4. Kovari claims that he spent the 120 driving hours in the back of the van, in a compartment Brevard refers to as the "cage." PTS Manual (June 2016), ECF No. 194-29, at 59. He claims that the cage was segmented into compartments only 30 inches wide, divided by a 79-inch metal wall dissecting the space. He said each section had a metal bench without cushions or seatbelts. ECF No. 193, at 5. Photographs show that Brevard installed seatbelts after the transport in question. Lewis Decl., ECF 194-30, at 2. Photographs, ECF No. 194-32. During the transport, Kovari was further restrained by shackles on his wrists and ankles, which he claims caused pain and swelling. Kovari Dep., ECF No. 194-2, 64:21-65:12. Cuneo claims that, recognizing Kovari's size, he used special "king kong" restraints, the largest they had.

5

Cuneo Dep., ECF No. 177-11, 132:7-20. Kovari complained about the pain to his drivers during the transport. Id. He shared his bench with other passengers during his transport, but the parties dispute the maximum number of passengers in the van at any given time.

At times, the transport van would stop at secure facilities for the night. ECF No. 177, at 5-6. However, Kovari alleges that on seven (7) different occasions, the van drove through the night. ECF No. 193, at 7. He claims that the van regularly went over six (6) hours without stopping for a restroom break, and on one instance may have gone over fourteen (14) hours without a break. Id. See also Lee Decl., ECF No. 194-25, at 28 (reconstructing the journey based on the van's GPS data procured from a third-party vendor). This resulted in passengers allegedly relieving themselves in the van, at times urinating in bottles, defecating on the floor, or vomiting on the floor. Kovari Dep. 188:3-6. Drivers involved in Kovari's transport are familiar with the practice of passengers urinating in bottles but have never explicitly instructed a passenger to do so. Diaz Dep., ECF No. 194-36, at 108:10-109:2; Caruso May 2 Dep., ECF No. 194-12, at 165:8-20. Kovari states that the drivers did not clean the back of the van, short of removing fast food wrappers after meals. ECF No. 193, at 8. However, some drivers claim that it was their practice to clean the van every time an inmate was dropped off. Ismael Torres Dep., ECF No. 177-15, at 79:24-25. During the course of the transport, passengers experienced erratic driving, sometimes at high speeds and other times with the van swerving off the road. ECF No. 193, at 9.

Kovari assert that when he complained of pain or discomfort, he was ignored. He claims he felt "extremely ill," including experiencing physical pain, headache, dizziness, disorientation, dehydration, and nausea. ECF No. 193, at 9. Based on these symptoms, he

claims he knew his blood pressure was elevated. Id. He maintains that he clearly, repeatedly, and emphatically communicated concerns about his blood pressure to the drivers and was either ignored or threatened with a taser. Id. at 9-10. He remembers drivers telling the other passengers that taking Kovari to the hospital would result in the remaining passengers waiting in the van until he was discharged, in what he believes was an attempt to escalate tension between the passengers and discourage Kovari's complaints. Id. Kovari also indicates he regularly requested medical assistance at the secure facilities at which the transport stopped, but was denied because his medical care was "PTS's responsibility." Id. Brevard refutes these assertions, claiming Kovari never requested or received medical care at any secure facility. ECF No. 177, at 16-17. Brevard claims that if Kovari had requested or received medical care, then the facility would have sent Brevard an invoice commemorating the interaction. Brasfield Decl. ECF No. 177-10, at 1-2.

Kovari states that he suffered physical and emotional harm from the trip. Upon arriving in Houston, he was hospitalized, rendered treatment, and prescribed medication to control his high blood pressure. Harris County Sheriff's Office (HCSO) Medical Records, ECF No. 194-28. Kovari alleges that this hospitalization was caused by the conditions of the transport and being denied his medication for the course of the trip. ECF No. 193, at 10. Brevard maintains that the transport received no instruction to provide medical care from Northwest Regional and that Kovari's condition predates the transport. ECF No. 177, at 3. Kovari's medical records reflect that he took his blood pressure medication "only intermittently" and Kovari admits to ceasing his blood pressure medication shortly after his release from detention. HCSO Medical Records, 194-28, at 8; Kovari Dep., ECF No. 194-2, at 168:18-169:13.

7

Kovari claims the severe pain he felt from the restraints, the confined space, and the inability to move persisted for some time after the transport, and that the swelling on his wrists and ankles remained for weeks. ECF No. 193, at 11. Emotionally, Kovari indicated that he felt like he was going to die in the van during the transport, remains traumatized by the experience and the sight of white vans, and suffers from poor sleep and nightmares as a result of the transport. Id. Kovari admits he has experienced sleep disturbances in the past, when a fellow inmate committed suicide seven years earlier. Kovari Dep., ECF No. 194-2, at 195:1-196:9.

Kovari contends that his transport is not unique; that Brevard maintains policies and customs that maximized business profits at the cost of the wellbeing of passengers. ECF No. 193, at 12. The contract between Brevard and Harris County was priced per prisoner, per mile, which Kovari claims incentivizes long, illogical routes that maximize miles per day and days per passenger. Id.; see also Harris County Contract, ECF No. 194-14, at 4. He claims that the declarations of Brevard employees show that they were instructed to take as infrequent breaks as possible and to "keep [their] rig rolling" for 60 to 70 hours straight. Id, at 14; PTS Manual, ECF No. 194-29, at 49.  The parties disagree about the extent to which routes are planned in advance to regularly provide restroom, meal, and sleep breaks as well as the degree to which Brevard employees are trained to assess and respond to passenger medical conditions. Brevard has been subject to lawsuits in the past, putting it on notice to challenges as to the constitutionality of its practices. ECF No. 193, at 19 (collecting cases).

## B.  PROCEDURAL HISTORY

8

On April 24, 2018, Kovari filed an action in district court against Brevard alleging several federal constitutional claims, pursuant to 42 U.S.C. § 1983, and state tort law claims. ECF No. 1. In response, Brevard filed a motion to dismiss count one of the complaint, Kovari's § 1983 constitutional claims, arguing that, based on the complaint, there were no grounds to find state action. ECF No. 20. Kovari responded, arguing that despite the fact that defendants were private entities, that state action doctrine applied when they were acting on behalf of the government, performing tasks that are generally the exclusive prerogative of the government. ECF No. 25. The court heard argument on the motion during a November 9, 2018 hearing and, for the reasons stated in open court, denied Brevard's motion to dismiss, finding that Kovari sufficiently pled facts to allege the private entities were acting under the color of state law. ECF No. 39. On December 21, 2018, the parties filed a joint stipulation of partial dismissal, dropping the claims against the John Doe defendants. ECF No. 47.

On April 26, 2019, in the midst of discovery, Brevard filed contemporaneous motions for a protective order to prevent Kovari from accessing financial records related to its net worth, ECF No. 77, and to bifurcate the trial on claims from the assessment of punitive damage, ECF No. 78. In support, Brevard principally argued that defendant entities' financial information was highly sensitive and to produce such evidence at trial before Kovari presented a prima facie case of liability would be highly prejudicial and would risk confusing the jury. Kovari responded to the motion for protective order, ECF No. 80, and the motion to bifurcate the trial, ECF No. 84. He argued that a plaintiff is not required to make a prima facie case for liability as a condition precedent to discovering information related to net worth in a punitive damages case, and that even if there was such a requirement, he has satisfied it with specific

9

allegations concerning the willful nature of Brevard's conduct. ECF No. 80. Additionally, Kovari states that the two protective orders already in effect are sufficient to protect any sensitive information from the public. Id. Further, Kovari argued a motion to bifurcate the trial with discovery ongoing was premature. ECF No. 84.

The court agreed with Kovari that the great weight of judicial precedent and the practical effect of the two protective orders already entered in this case counsel against granting Brevard's motion for protective order. Accordingly, the motion for protective order was denied. ECF No. 88. The court also granted the motion to bifurcate, finding separate trials on the issue of punitive damages and the establishment of liability necessary to prevent undue prejudice to Brevard. Id.

On May 24, 2019, Kovari entered a motion for extension of time to complete discovery and for continuation of trial, originally set to begin August 19, 2019. ECF No. 89. He also filed a motion to expedite the resolution of these requests given that discovery was scheduled to close on June 7, 2019 per the terms of the original scheduling order. ECF No. 90. He argued that although it had engaged in active discovery from the outset and had intended to complete discovery by the original deadline, Brevard had produced "the vast majority" of their responsive documents in the last six weeks of discovery, including one "highly relevant document" produced two days prior to the filing for an extension. Id. Magistrate Judge Joel C. Hoppe heard arguments on the proposed extension on June 6, 2019 and reviewed the relevant documents. Magistrate Judge Hoppe found good cause to extend the close of discovery and continue the trial date. ECF No. 101.

On June 20, 2019, Brevard filed for leave to amend their answer to include the affirmative defense of the statute of limitations, which they claim they did not know applied until they reviewed Kovari's discovery disclosures. ECF No. 106. Namely, Brevard claims that the deposition they took of Kovari's expert Dr. Susi Vassallo demonstrates that "this case is not a garden-variety personal injury case potentially subject to a two year statute of limitations, but, instead, is a claim based purely on conditions of confinement," which "may be governed, in whole or in part, by the one year limitations in Virginia Code § 8.01-243.2. Id. at 2. In response, Kovari argued that there had been no new information in Dr. Vassallo's deposition that was not included in the complaint, that both federal and Virginia courts have found that the one-year limitation in § 8.01-243.2 does not apply to claims of constitutional deprivations, and that Virginia substantive law does not apply to this case. ECF No. 109. However, Kovari did not oppose the motion for leave and the court granted it. ECF No. 112.

On September 6, 2019, Brevard filed a second motion to bifurcate the trial, this time requesting that the court try separately the constitutional claims and the state tort law claims. ECF No. 116. Brevard argued that the § 1983 claims hinge on establishing unconstitutional policies or practices whereas the tort law claims require the showing of a breached duty of care, which Brevard contended are sufficiently different to warrant separate trials. Id. Brevard also claimed that the evidence required to establish policies and practices, such as conditions on prior transports, would be unrelated to tortious liability and would prejudice the jury. ECF No. 117. Kovari rejected these assertions, claiming that he anticipated substantial overlap in evidence used to support his constitutional claims and his state law claims. ECF No. 141. He argued that in addition to an agency theory of liability, he would also argue that defendant-

corporate entities directly failed a duty of care in establishing unreasonable policies and practices. He also argued that he would use evidence of prior similar incidents and corporate policies to demonstrate notice and intent for the tort claims. Id. Brevard replied that such uses of evidence are impermissible under federal rules and Virginia law, and that to permit such arguments would confuse the jury. ECF No. 145. The court found a de facto trifurcation of the trial, in light of the prior order granting a bifurcation, unworkable and unwarranted under the circumstances. ECF No. 152.

Contemporaneous to the second motion to bifurcate, Brevard also moved for partial summary judgment, asserting that Kovari's four claims relating to conditions to confinement ought to be dismissed as a matter of law. ECF No. 118. Brevard argued that the Virginia Code, setting a shorter statute of limitations for conditions of confinement claims than for general personal injury claims, applies in this case and forecloses Kovari's pursuit of these causes of action. Because more than a year had elapsed between the transport and the date on which this suit was filed, Brevard claimed it was entitled to judgment as a matter of law on these claims. Kovari responded that because he was in the custody of a private transport under contract with Harris County Sheriff's Office out of Texas, then § 8.01-243.2 does not apply to him. Brevard replied, arguing that Kovari's reading of the Virginia Code violated the Dormant Commerce Clause and the Equal Protection Clause. ECF No. 135, at 5. The court agreed with Kovari, finding the statute inapplicable, and denied Brevard's motion for summary judgment as to all claims arising out of Kovari's conditions of confinement.

## I.    EXPERT MOTIONS

12

First, the court will address expert motions, because their resolution will determine which evidence the court is permitted to consider for summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Brevard filed motions to exclude entirely the testimony of Dr. Susi Vasallo, ECF No. 174, and Eric L. Clark, ECF No. 179. Kovari filed a motion to limit the scope of testimony by Charles Hildebrand. ECF No. 182.

The admissibility of expert reports and future testimony at trial is governed by Federal Rule of Evidence 702.[2] F.R.E. 702. Rule 702's prescriptions are guided by the Supreme Court's decisions in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), and Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999). In Daubert, the Court explained that the "trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589. Under Rule 702, "expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful" to the trier of fact. Id. at 591. In Kumho Tire, the Supreme Court made clear that these principles apply to all proposed expert witnesses. 526 U.S. at 141. "The question of whether a witness is qualified to testify is context-driven and can only be determined by the nature of the opinion he offers." RG Steel Sparrows Point, LLC v. Kinder Morgan Bulk Terminals, Inc., 609 F. App'x 731, 738 (4th Cir. 2015).

---

[2] Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

"[C]ourts should be conscious of two guiding, and sometimes competing principles: Rule 702 was intended to liberalize the introduction of relevant expert evidence and expert witnesses have the potential to be both powerful and quite misleading." Hickerson v. Yamaha Motor Corporation, 882 F.3d 476, 481 (4th Cir. 2018). "[A] trial judge has a great deal of discretion in deciding whether to admit or exclude expert testimony." United States v. Dorsey, 45 F.3d 809, 814 (4th Cir. 1995).

This court is obligated to act as a gatekeeper for expert opinions, but it notes that the "traditional and appropriate means" of challenging expert testimony are "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof…." Glass v. Anne Arundel Cty., 38 F. Supp. 3d 705, 714 (D. Md. 2014), aff'd, 716 F. App'x 179 (4th Cir. 2018). Accordingly, "[t]he court need not determine that the expert testimony is irrefutable or certainly correct." United States v. Moreland, 437 F.3d 424, 431 (4th Cir. 2006), overruled on other grounds, U.S. v. Foote, 784 F.3d 931 (4th Cir. 2015).

## A. DR. SUSI VASSALLO

In challenging the admissibility of Dr. Vassallo's testimony in this case, Brevard raises several objections: (1) Dr. Vassallo is not qualified to provide expert medical testimony; (2) Dr. Vassallo's testimony is irrelevant; (3) Dr. Vassallo's opinions are unreliable; and (4) Dr. Vassallo does not provide opinions to a reasonable degree of probability. ECF No. 175, at 13. Kovari has retained Dr. Vassallo, a practicing physician and professor of emergency medicine, to assist the jury in understanding medical concepts it will hear about at trial. ECF No. 204, at 2. Specifically, Dr. Vassallo will be asked to testify about hypertension and whether it is a serious medical condition, about Kovari's medical records and how they should be interpreted,

14

about the risk posed by the transport experience to individuals with Kovari's conditions, about Kovari's hospitalization in Houston, about Kovari's blood pressure readings before and after the transport and how to interpret them, and about the risk posed by Brevard's policies to individuals with underlying medical conditions. Id. at 3-4.

First, the court addresses Dr. Vassallo's qualifications. Upon reviewing Dr. Vassallo's curriculum vitae, the court finds her background in emergency medicine extensive. ECF No. 175-14. Beyond her 35 years as a practicing physician, Dr. Vassallo has served a two-year appointment as an expert evaluating medical care in detention facilities for the Department of Homeland Security and has given a national lecture in 2015 on reducing death from heat in prisons. Id. She is board certified to practice emergency medicine and medical toxicology. ECF No. 175-13. She is also a Certified Correctional Health Professional by the National Commission on Correctional Health Care. Id. In her capacity as a healthcare professional, she has treated many prisoners and has previously testified in litigation involving conditions of confinement in correctional facilities. Vassallo Dep., ECF No. 175-15, at 13-15. Dr. Vassallo has indicated she has treated hundreds of prisoners as well as hundreds of patients with Kovari's conditions. Vassallo Rep., ECF No. 175-13, at 2.

Brevard argues that Vassallo is not qualified to provide testimony in this case given her lack of knowledge about prison transportation, the details about Kovari's specific transport, specifications about the van used, and the nature of the training Brevard provides its employees. ECF No. 175, at 13-15. Brevard's arguments do not seem to challenge Dr. Vassallo's qualifications to interpret Kovari's medical records or blood pressure readings, or her ability to testify as to the nature and seriousness of Kovari's underlying conditions such as

15

obesity and hypertension. The thrust of Brevard's objections to Dr. Vassallo's qualifications seem to argue that a familiarity with treating prisoners generally does not qualify Dr. Vassallo to opine "on the policies and practices applicable to the actual transport." Id.

The court finds Dr. Vassallo abundantly qualified to provide expert medical testimony regarding the nature of Kovari's underlying conditions, the information in Kovari's medical records, the interpretation of blood pressure readings, and the conditions that may exacerbate Kovari's underlying conditions. Her experience as an academic and practicing physician qualifies her to provide routine medical expert testimony about the severity and treatment of Kovari's conditions. Dr. Vassallo has unique experience treating prisoners specifically, but the court would have found her qualified to address matters involving Kovari's medical conditions without such experience. Dr. Vassallo's lack of experience working with passengers in long distance transports, her lack of knowledge of the private transport industry, and her lack of total recall as to the facts of this specific transport do not disqualify her as an expert. See Friendship Heights Assocs. v. Vlastimil Koubek, A.I.A., 785 F.2d 1154, 1159 (4th Cir. 1986) ("Thus, the fact that he lacked experience with the particular item at issue did not preclude his testifying as an expert."); see also Thornhill v. Aylor, No. 3:15-CV-00024, 2017 WL 4770950, at *3 (W.D. Va. Oct. 19, 2017) (rejecting defendants' argument that expert should be excluded because she "lacks sufficient familiarity with the defendants' medical practice, which involves a correctional setting," explaining that it "[did] not find the correctional setting significant" and that expert "possess[ed] the necessary experience in treating patients…."); Dotson v. Joseph, No. 3:04-CV-10099, 2005 WL 3434983, at *10 (W.D. Va. Dec. 8, 2005), report and recommendation adopted in part and modified in part on other grounds, No. 3:04-CV-10099,

16

2006 WL 213712 (W.D. Va. Jan. 26, 2006) ("[I]t is immaterial that neither doctor had experience practicing in a correctional facility."). Dr. Vassallo's credentials clear the bar set by Rule 702, and if Brevard finds gaps in her experience or knowledge that may discredit her testimony, they are free to cross-examine her on alleged deficiencies at trial. Glass, 38 F. Supp. 3d at 715–16 (finding that expert's purported "failure to take other data into account—go to the weight of the report, not its admissibility, and may be challenged on cross examination").

However, the court finds Dr. Vassallo unqualified to opine on the narrow issue of Brevard's specific policies. Kovari has indicated he aims to solicit Dr. Vassallo's opinion, as a medical professional, "regarding why Defendants' policies – which vest their drivers and rank-and-file employees with authority to make medical decisions for passengers – are dangerous." ECF No. 204, at 4 (citations omitted). Dr. Vassallo is permitted to provide testimony regarding general conditions or factual circumstances of the transport that may exacerbate Kovari's underlying conditions, but she is not qualified based on her experience as a physician to prophesize about potential harm arising out of Brevard's policies and procedures. Such an opinion would require Dr. Vassallo to interpret documents and make assumptions for which she has no basis for expertise. Further, the jury does not require the assistance of an expert to extrapolate from permitted expert testimony about Kovari's medical conditions and circumstances that would exacerbate them to the practical implications of Brevard's policies.

Brevard also suggests Dr. Vassallo's testimony is irrelevant to the case. The court finds no basis for this contention, given that the crux of Kovari's claims is that he was physically harmed by the transport. Both his constitutional law and tort law claims are predicated on the showing of a serious risk of harm or actual harm. See, e.g., Thompson v. Virginia, 878 F.3d

89, 107 (4th Cir. 2017) (case concerning constitutional challenge to conditions of confinement); Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016) (case involving deliberate indifference to medical needs). Courts routinely rely on medical experts in cases that hinge on an understanding of the nature, causes, treatment, rarity, and severity of a medical condition. Brevard seeks to exclude Dr. Vassallo as irrelevant because, in its reading of the testimony, Dr. Vassallo does not find a causal relationship between the transport and Kovari's hospitalization and so her testimony does not help resolve the core factual disputes in this case. ECF No. 174, at 17 ("In sum, Vassallo does not express any opinion that Plaintiff suffered harm as a result of Defendants' policies, conditions of confinement, or denial of medical care."). However, Kovari claims Dr. Vassallo's testimony does support the finding of causation. See Vassallo Dep., ECF No. 204-5, at 47:15-20) (Question: "Okay, did Mr. Kovari suffer any harm as a result of his transport to a reason [sic] degree of probability?" Answer: "The answer is yes."). Viewing the evidence in the light most favorable to the non-moving party, the court finds Dr. Vassallo's testimony, taken as a whole, does support causation. Regardless, the question of causation is an ultimate issue for the fact finder to resolve and so, the jury can find the existence of causation if the totality of evidence proffered at trial supports it even if Kovari's expert cannot definitively conclude as much.

Next, Brevard argues that the basis for Dr. Vassallo's opinions is not reliable. It argues that she relies on standards from the American Correctional Association ("ACA") and the National Commission on Correctional Health Care ("NCCHC"), which are not the "minimum" standards at issue in a constitutional inquiry, but rather "aspirational" goals. ECF No. 175, at 19. However, the court finds that the bulk of Dr. Vassallo's opinions do not rely

on these standards at all, but are based on her specialized knowledge and experience as a physician in emergency room medicine and treating prisoners.[3] Additionally, the court finds these standards are relevant to the arguments that Brevard breached a duty of care and were deliberately indifferent to medical needs, especially in light of the fact that employees for Brevard have indicated that their policies were modeled in part based on ACA standards. See e.g., Caruso Dep., ECF No. 204-9, at 136:10-21, 187:6-20; Brasfield Dep., ECF No. 204-10, at 39:21-40:7. Finally, the court finds Brevard misreads the case law on the issue, interpreting cases that find that violations of industry standards are not per se violations of constitutional law to mean that industry standards are wholly irrelevant to establishing a constitutional violation. Doe By & Through Lopez v. Shenandoah Valley Juvenile Ctr. Comm'n, No. 5:17-cv-97, 2018 WL 6581220 (W.D. Va. Dec. 13, 2018); Alexander S. v. Boyd, 876 F. Supp. 773, 798-99 (D. S.C. 1995). Kovari cannot establish constitutional deprivation by reference to these industry standards, but their violation can certainly serve as evidence that makes the violation of a constitutional minimum standard more likely than not.

Finally, Brevard claims Dr. Vassallo's testimony should be precluded because she does not express her opinions to a reasonable degree of certainty. The court finds this argument unavailing as Dr. Vassallo's report concludes that "Mr. Kovari had a number of serious health conditions at the time that he was transported"; and "[h]e was an individual who needed special care during his transport." Vassallo Rep., ECF No. 175-13, at 12-13. Further, her supplemental report unequivocally refutes conclusions drawn by Brevard's expert, Dr. Kevin

---

[3] Dr. Vassallo relies on the contested industry standard specifically in addressing Brevard's policies and procedures, which this court has held herein is outside the scope of her permissible testimony. Therefore, the risk of introducing these standards at trial is essentially obviated. Vassallo Rep. ECF No. 175-13, at 12.

Scott Ferentz, including his opinion that Kovari did not have hypertension, take medication for it, and experience symptoms as a result of it. Vassallo Suppl. Rep., ECF No. 175-16. The court finds no reason to believe Dr. Vassallo equivocates such that her testimony should be precluded.

Accordingly, the court **DENIES in part** Brevard's motion to exclude the testimony of Dr. Vassallo. Her expert testimony is permitted to all matters related to Kovari's medical conditions and medical records, including opinions as to whether certain stressors may exacerbate certain medical conditions. However, Dr. Vassallo is not permitted to opine on the risks presented by Brevard's policies and procedures, such as the discretion it affords drivers in picking up passengers, to the extent that she references, interprets, or applies them.

### B.     ERIC L. CLARK

Brevard files a motion to exclude the testimony of Eric C. Clark, offered by Kovari as an expert on best practices for transporting prisoners. ECF No. 180. Kovari expects to call on Clark to testify on the need for planned restroom breaks, the unsanitariness of letting inmates urinate on the transport, the pre-transport assessment required for passengers with special needs, and the proper response to complaints of pain and requests for medical attention during the transport. Brevard argues that Clark should be excluded because: (1) he has no experience with long distance transports; (2) his opinions rely on an incorrect standard; and (3) he is unfamiliar with the facts of this case. ECF No. 180.

Brevard claims that Clark lacks sufficient experience with or knowledge of the private transport industry, long distance extraditions, and the statutes and regulations on which he bases his opinions. ECF No. 180, at 3. In so arguing, Brevard seems to challenge Clark's

20

qualifications as an expert on long distance transports and the foundation of his opinions regarding reasonable policies compliant with applicable law. Clark retired from an over twenty (20) year career with the U.S. Marshals Service ("USMS") in August 2017, where he directed and executed the transportation of adult and juvenile prisoners. Clark Rep., ECF No. 205-1, at 3. He claims he has experience transporting several hundred passengers each day on local, mid-range, and long-distance extraditions. Id. at 4. Clark also has experience serving as an instructor training other law enforcement officers on prison transportation. Clark Rep., ECF No. 205-1, at 4-5. Brevard argues that Clark's routes were, at their longest, no more than eight (8) hours and therefore incomparable to the multi-day transports at issue in this case. ECF No. 180, at 4.

The court finds Clark qualified to provide opinions on prison transport practices, reasons for their development, and risks of nonenforcement. The jury could benefit from expert testimony explaining the unique factors prison transports must account for, such as public safety, and the external limitations to route design, such as the availability of secured facilities. To the extent Clark lacks firsthand experience with private transports and long distance transports like the one at hand, the court finds these issues go to the weight of Clark's testimony, not its admissibility. See Friendship Heights Assocs., 785 F.2d at 1159. Brevard may bring up any gaps in knowledge or experience on cross-examination.

Further, the court does not find Clark's lack of familiar with laws and regulations such as the Interstate Transportation of Dangerous Criminals Act of 2000 (also known as "Jeanna's Act"), 34 U.S.C. § 60103, a statute governing the private transportation industry, to be fatal to his testimony. Clark references the statute, and related regulations, to draw comparisons

21

between the standards that apply to USMS for prison transport and the standards that apply to private transports. Indeed, Jeanna's Act does not permit "stricter standards with respect to private prisoner transport companies than are applicable, without exception, to the United States Marshals Service, Federal Bureau of Prisons, and the Immigration and Naturalizations Service when transporting violent prisoners under comparable circumstances." Id. As such, Clark's experience transporting prisoners for the Marshals Service is directly relevant. Brevard may attempt to discredit Clark's testimony on the comparison of regulations that apply to private transport to those that apply to federal transport on cross-examination.

Brevard also suggests Clark's opinion is unreliable because it is based on inapplicable standards. Similar to the court's response to Brevard's objection to Dr. Vassallo's testimony on the same grounds, the court finds that Clark's reference to "best practices" are not fatal to the admissibility of his testimony. First, the court finds that Clark's use of the term "best practices" does not suggest that those standards are aspirational and purely voluntary. They appear to be mandatory internal guidelines for USMS. Clark Dep., ECF No. 180-3, at 279:5-18. Second, the court finds that while expert opinions as to desirable prison transport conditions are insufficient to establish constitutional minima, they can be "helpful and relevant." Braggs v. Dunn, 317 F.R.D. 634, 651 (M.D. Ala. 2016) (quoting Rhodes v. Chapman, 452 U.S. 337, 348 n. 13 (1981)). Indeed, the bulk of Clark's testimony does not belabor the care that "should" be provided to passenger, but rather "how the failure to provide care in this way causes harm to prisoners." Id. Kovari may introduce these best practices in his attempt to "reveal the wide chasm between Defendants' policies and practices and best

22

practices in the prison transport industry" if doing so makes the existence of a constitutional violation more likely than not. ECF No. 205, at 3.

Brevard also seeks preclusion of Clark's testimony on the basis that he lacks proper foundation due to his lack of familiarity with the facts of this case. Kovari offers Clark to support his <u>Monell</u> claim that Brevard maintained unconstitutional policies and practices, which does not require Clark to have any specific factual knowledge of Kovari's specific transport. The court finds that Clark has sufficient foundation to opine on Brevard's policies, how they compare to USMS policies, and the risks they pose to passengers generally given his experience. Additionally, Clark's opinion that a prisoner whose records indicate that he had received prior hospitalization for heart monitoring needs a special transport does not exceed the scope of his expertise. Clark Rep., ECF No. 205-1, at 10-11. Clark's opinion is valid as long as he is being asked to apply his personal knowledge and experience to hypothetical scenarios. However, Clark's lack of specific knowledge as to the circumstances of Kovari's transport precludes him from offering an opinion as to whether Brevard's policies caused Kovari any harm.

Brevard's claim that Clark's testimony is irrelevant as it does not go to the issue of damages also fails. Clark's testimony is relevant to help the jury apply an objective constitutional standard of care to a specialized industry. The Federal Rules of Evidence indicate that expert testimony is permissible only when it will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Testimony from an expert is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror. <u>Persinger v. Norfolk & Western Railway Co.</u>, 920 F.2d 1185,

1188 (4th Cir. 1990) (testimony about how difficult it is to lift heavy things is not "helpful" and is thus excludable). "On the other hand, any 'objective' test implies the existence of a standard of conduct, and, where the standard is not defined by the generic—a reasonable person—but rather by the specific—a reasonable officer—it is more likely that Rule 702's line between common and specialized knowledge has been crossed." Kopf v. Skyrm, 993 F.2d 374, 378 (4th Cir. 1993). Clark's testimony on standards of care in a specialized industry in a case litigating the reasonableness of a defendant's policies is plainly relevant. However, he will not be permit to offer his opinion about whether Brevard's policies fall below the constitutional minimum as that is a legal conclusion in the province of the jury. "Trouble is encountered only when the evaluation of the commonplace by an expert witness might supplant a jury's independent exercise of common sense." Scott v. Sears, Roebuck & Co., 789 F.2d 1052, 1055 (4th Cir. 1986).

Accordingly, Brevard's motion to preclude the testimony of Eric L. Clark is **DENIED**, subject to the limitations on Clark's testimony included herein.

## C.   CHARLES HILDEBRAND

Kovari filed a motion to limit the scope of permissible testimony for Brevard's expert Charles Hildebrand who, like Clark, is offered to address the reasonableness of Brevard's policies and procedures. Unlike Brevard, Kovari does not seek to preclude Hildebrand from testifying at all, but rather to prevent testimony on: (1) whether passengers urinated or defecated in the van during Kovari's transport; (2) the number and frequency of bathroom breaks on the transport; (3) the provision of food and water on the transport; (4) the number and placement of passengers in the van; (5) the functionality of the air conditioner in the van;

24

(6) the availability of beds, showers, and laundry during the transport; (7) the type of shackles used on Kovari; (8) whether transport employees knew about Kovari's medical condition. ECF No. 183. He argues that these opinions are unqualified lay opinions with insufficient foundation. Id. Brevard disagrees that Hildebrand's testimony is deficient and opposes its exclusion. ECF No. 203.

According to his report, Hildebrand is an experienced in correctional facility management and security, serving both public and private facilities. Hildebrand Rep., ECF No. 183-2, at 1-4. In his role as a Security Specialist/Emergency Manager for the Colorado Department of Corrections, he helped draft policies, administered trainings, and provided subject matter expertise on topics including offender management, offender transportation, use of force, security procedures, and emergency management. Id. at 2. He has worked in similar security-focused capacities at other correctional institutes in management and as a consultant. Id. at 3. Hildebrand indicates he has experience conducting and supervising individual and mass transports of offenders, including by van, on multiday journeys, across state lines. Id. at 4. He also has experience coordinating with private contractors regarding staffing for hospital security and transports for state facilities. Id.

The court finds Hildebrand qualified to opine generally on transport procedure, security concerns, differences between public and private correctional industry entities, staff training, applicable industry standards regarding transports, and the logistics of long-distance transports involving multiple passengers based on his extensive experience in the industry. However, the court agrees with Kovari that the basis for his expertise does not qualify him to weigh in on factual disputes regarding Kovari's specific transport.

The court finds that factual conclusions about Kovari's transport go beyond the scope of Hildebrand's expertise and are based on suspect methodology.  Hildebrand's testimony regarding the topics Kovari seeks to preclude largely suffer the same defect: the opinions do not rely on his specialized knowledge or experience and are not born out of a defensible methodology recognized in the field. In evaluating this proffered expert testimony, the court must engage in "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001) (quoting Daubert, 509 U.S. at 592–93). Hildebrand's opinions regarding most of the challenged topics are based on reading documents, interpreting the absence of certain documents, and crediting accounts of the transport provided by Brevard's employees to resolve factual disputes about the conditions of the transport central to this case. First, the court finds Hildrebrand's reliance on the testimony of some witnesses to the exclusion of others invades the province of the jury in weighing evidence and making credibility determinations. United States v. Dorsey, 45 F.3d 809, 815 (4th Cir. 1995). Second, the court finds assumptions that the lack of documentation about an event, such as a failure to provision food or water, means that the event did not transpire to be unfounded, beyond the scope of Hildebrand's expertise, and "based on…belief or speculation." Oglesby v. General Motors Corp., 190 F.3d 244, 250 (4th Cir. 1999). Further, Rule 702 only permits the admittance of expert testimony when it would help the jury understand evidence or resolve a factual dispute. Persinger, 920 F.2d at 1188. The jury does not need the assistance of an expert to draw its own conclusions about the significance of a document's absence.

26

Moreover, Hildebrand's testimony regarding human waste, provision of food and water, passenger placement in the van, functional air conditioning, access to beds and hygiene, the size of shackles, and whether Brevard's employees knew about Kovari's conditions constitutes lay opinion lacking a rational basis in Hildebrand's perception. See Fed. R. Evid. 701. "A critical distinction between Rule 701 and Rule 702 testimony is that an expert witness 'must possess some specialized knowledge or skill or education that is not in possession of the jurors.'" Certain Underwriters at Lloyd's, London v. Sinkovich, 232 F.3d 200, 203 (4th Cir.2000) (citation omitted).  While the same witness can provide lay and expert testimony, it is axiomatic that lay testimony must be "based on the perception of the witness." TLT–Babcock Inc. v. Emerson Elec. Co., 33 F.3d 397, 400 (4th Cir.1994) (citing Fed. R. Evid. 701). Hildebrand has no personal knowledge of the conditions of the transport and cannot testify as to their existence. Brevard cannot introduce lay opinion dressed as expert testimony. See United States v. Johnson, 617 F.3d 286, 293 (4th Cir. 2010).

However, the court finds that, if Brevard can establish that the trip logs it introduces at trial are standard in the industry, Hildebrand will be permitted to testify as to their contents based on his experience. A jury may be able to understand the contents of such logs without assistance, but given their unintuitive nature, the court finds an expert may be useful. Additionally, the court finds the content of the trip logs to be inextricably tied to the valid opinions Hildebrand seeks to introduce such as reasons for allegedly circuitous routes and limited breaks. Should Kovari disagree with Hildebrand's interpretation of the records, he may introduce contrary evidence or cross-examine him on the subject. Further, while Hildebrand will not be permitted to testify as to the actual availability of showers, beds, or laundry to

27

Kovari, he will be allowed to address whether such accommodations are common at secure facilities and whether they are routinely made available to private transports. Similarly, he may also address the availability of different sizes of restraints, passenger placement practices in a vehicle, and schedule of food and water provisions in the industry generally.

Accordingly, as with Brevard's motion as to Clark, the court **GRANTS in part** and **DENIES in part** Kovari's motion to limit the expert testimony of Charles Hildebrand.

## II.    APPLICABLE LAW FOR SUMMARY JUDGMENT

Kovari's four causes of action are currently before the court: (1) constitutional deprivation, (2) negligence, (3) gross negligence, (4) intentional affliction of emotional distress. Compl., ECF No. 1. In support of the constitutional cause of action, Kovari alleges two related theories of liability: unconstitutional conditions of confinement and deprivation of medical care. Brevard moves for summary judgment on all claims. ECF No. 177.

### A.    LAW FOR SUMMARY JUDGMENT

Pursuant to Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with … [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit

under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" McAirlaids, Inc. v. Kimberly–Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (citing Tolan v. Cotton, 572 U.S. 651 (2014) (per curiam)).

Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255. The non-moving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." Moss v. Parks Corp., 985

29

F.2d 736, 738 (4th Cir. 1993) (quoting Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 124 (4th Cir. 1990)). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. World-Wide Rights Ltd. P'ship v. Combe Inc., 955 F.2d 242, 244 (4th Cir. 1992).

## B.     LAW GOVERNING § 1983 CLAIMS

To survive summary judgment on the constitutional claims, Kovari must make a prima facie case of a § 1983 violation. In order to state a cause of action under § 1983, a plaintiff must allege that (1) the named defendant deprived him of a federal right, and (2) the defendant did so under color of state law. Dykes v. Inmate Servs. Corp., No. 9:14-CV-3609-RMG-MGB, 2017 WL 9286983, at *25 (D.S.C. Jan. 23, 2017), report and recommendation adopted, No. CV 9:14-3609-RMG, 2017 WL 496065 (D.S.C. Feb. 7, 2017) (citing Gomez v. Toledo, 446 U.S. 635, 640 (1980)); See also Nave v. Trans-Cor of America, No. 8:06-1065, 2007 WL 2156670, at *4 (D.S.C. July 26, 2007) (refusing to dismiss a 1983 claim against a prison transport company on the grounds that it was not a state actor). In DeBauche v. Trani, the Fourth Circuit set out the "four exclusive circumstances" under which a private party could be deemed a state actor, including "when the state has sought to evade a clear constitutional duty through delegation to a private actor ... [or] delegated a traditionally and exclusively public function to a private actor." 191 F.3d 499, 506 (4th Cir. 1999).

Kovari must establish § 1983 liability under Monell, and not the doctrine of respondeat superior. Karn v. PTS of Am., LLC, No. CV GJH-16-3261, 2017 WL 4162251, at *7 (D. Md. Sept. 19, 2017) (citing Monell v. Dep't of Soc. Serv. of City of New York, 436 U.S. 658 (1978)). The Fourth Circuit has extended Monell's exclusive applicability to private corporations as

well as municipalities. Estate of Alvarez v. Johns Hopkins Univ., 275 F. Supp. 3d 670, 689 (D. Md. 2017) (citing Powell v. Shopco Laurel Co., 678 F.2d 504, 506 (4th Cir. 1982) (extending Monell) . Under Monell, as extended by Powell, a § 1983 cause of action may be maintained against a private corporation only when execution of the state actor's unconstitutional policy or custom causes a plaintiff injury. Lee v. Queen Anne's Cty. Office of Sheriff, No. CIV.A. RDB-13-672, 2014 WL 476233, at *10 (D. Md. Feb. 5, 2014); see also Walker v. Prince George's Co., Md., 575 F.3d 426, 431 (4th Cir. 2009) (stating that the liability of the municipality only arises where the employees' unconstitutional actions are taken in furtherance of a municipal policy or custom); Bain v. Transcor Am., LLC, No. 3:08-0656, 2009 WL 4348598, at *6-7 (M.D. Tenn. Nov. 24, 2009) (applying Monell to federal claims against a private company that provided prisoner and detainee transportation services).

Because Kovari has voluntarily dismissed his claims against Brevard employees in their personal capacities, he must show Brevard, the employer, maintained unconstitutional policies or customs. See, e.g., Karn v. PTS of Am., LLC, No. 16-CV-3261, 2017 WL 4162251, at *5 (D. Md. Sept. 19, 2017) (noting that the plaintiff could "proceed only against the PTS employees in their personal capacities or establish that the employees were acting pursuant to an official policy or custom of PTS."); Amberslie v. Prisoner Transp. Serv. of Am., LLC, No. 917CV0564TJMDEP, 2019 WL 1024183, at *13 (N.D.N.Y. Mar. 4, 2019), report and recommendation adopted, No. 917CV0564TJMDEP, 2019 WL 1368860 (N.D.N.Y. Mar. 26, 2019). To hold a municipality liable for an unconstitutional policy or custom, plaintiff must allege liability "(1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission,

such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.' " Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (internal citations omitted).

## C.   LAW GOVERNING TORT CLAIMS

As a preliminary matter, the court must decide which body of law governs Kovari's tort claims. A district court located in Virginia must apply Virginia's choice of law rules to decide this issue. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941). Virginia applies the lex loci delicti, the law of the place of the wrong, to tort actions like this one. See, e.g., Jones v. R.S. Jones and Assoc., Inc., 246 Va. 3, 431 S.E.2d 33, 34 (1993); Buchanan v. Doe, 246 Va. 67, 431 S.E.2d 289, 291 (1993). "The word 'tort' has a settled meaning in Virginia. A tort is any civil wrong or injury; a wrongful act." Buchanan, 431 S.E.2d at 291 (citations omitted); see also Prosser and Keeton on Torts 2 (5th ed.1984). "Thus, Virginia's choice of law rule selects the law of the state in which the wrongful act took place, wherever the effects of that act are felt." Milton v. IIT Research Inst., 138 F.3d 519, 522 (4th Cir. 1998); see also Jones v. R.S. Jones & Assocs., Inc., 246 Va. 3, 5, 431 S.E.2d 33, 34 (1993) (applying lex loci to multistate tort action).

However, given that Kovari alleges a continuing injury, arising out of persistent conditions of confinement and denial of medical care, the place of injury is less clear. "Under Virginia law, the 'place of the wrong' is the place 'the last event necessary to make an [actor] liable for an alleged tort takes place.'" General Assur. of America, Inc. v. Overby–Seawell, 533 Fed. Appx. 200, 206 (4th Cir. 2013) (quoting Quillen v. Int'l Playtex, Inc., 789 F.2d 1041, 1044

(4th Cir. 1986)). Accordingly, Virginia law applies the substantive law of the state where the first causally related legal injury occurred for continuing injuries, such as tortious interference with business or conspiracy. Meadows v. Northrop Grumman Innovation Sys., Inc., No. 7:19-CV-00394, 2020 WL 476671, at *5 (W.D. Va. Jan. 29, 2020); Ford Motor Co. v. Nat'l Indem. Co., 972 F. Supp. 2d 850, 856 (E.D. Va. 2013). The first legal injury is identified as the moment when the "last event necessary" to establish liability for the tort occurred. Id. See also Insteel Industries v. Costanza Contracting Co., 276 F. Supp. 2d 479, 486–87 (E.D.Va.2003) (applying the substantive law of the state where the last element to establish liability, reasonable reliance on the false representation, occurred).

For negligence, gross negligence, and intentional infliction of emotional distress, the final element that completes the legal injury is the infliction of actual damage. To establish a claim for either ordinary or gross negligence, a plaintiff must prove the existence of a duty, a breach of that duty, causation in fact, proximate causation, and damages resulting from the breach. Cole v. Eckerd Corp., 54 Va. Cir. 269, 270 (Va. Cir. 2000). To establish a claim for intentional infliction of emotional damage, a plaintiff must establish that the accused entity's conduct was intentional or reckless, that the conduct was outrageous or intolerable, that the conduct caused the plaintiff emotional distress, and that the emotional distress was severe. Russo v. White, 241 Va. 23, 26 (1991); Hazzis v. Madjadidi, 69 Va. Cir. 385, 388 (2005). In Virginia, accrual of a cause of action for injury to property takes place when the first measurable damage occurs, "however slight it may be." Forest Lakes Cmty. Ass'n, Inc. v. United Land Corp. of Am., 293 Va. 113, 124, 795 S.E.2d 875, 881 (2017) (quoting S. Ry. Co. v. Leake, 140 Va. 438, 441, 125 S.E. 314, 315 (1924)). Similarly, in a negligent loss of

consortium case, Virginia law dictated that the injury was received when the plane crashed and the spouse was lost, regardless of where the plane took off from or where the surviving spouse was at the time of death. Kelley v. United States, 580 F. Supp. 2d 490, 493 (E.D. Va. 2008).

Finding these cases instructive, the court finds that that Kovari's place of the wrong would be the location where Brevard committed the final act that caused Kovari to experience harm for the first time. However, the transport spanned multiple states and depending on plaintiff's theory of the case, defendant's actions in different states may have given rise to different claims. In a similar multi-state, multi-defendant tort case, a court in this district recognized that Virginia's impetus for applying lex loci delicti was "uniformity, predictability, and ease of application." Gilmore v. Jones, 370 F. Supp. 3d 630, 665 (W.D. Va. 2019), motion to certify appeal granted, No. 3:18-CV-00017, 2019 WL 4417490 (W.D. Va. Sept. 16, 2019) (quoting McMillian, 253 S.E.2d at 664). Accordingly, the court will apply the substantive law of one state to all causes of action arising out of the same set of facts, thereby avoiding "the cumbersome application of a patchwork of state law" for different claims tied to different locations of first injury. Id.

The court finds Virginia substantive law applies in this case because the acts that gave rise to Kovari's physical and emotional harms first occurred in Virginia, as he was first picked up by Brevard from Northwest Regional in Winchester, Virginia. Upon his pickup in Virginia, Kovari alleges that he was first deprived of his medication, placed in the back of a cramped van, and put in tight shackles. While the extent of his injury may have increased over the course of the transport, due to the compounding effects of the denial of medical care and conditions of the transport, the location of first injury is still Virginia. The apex of Kovari's injury was

felt in Texas, but Virginia courts have repeatedly rejected the application of the test propounded by the Second Restatement, asking which state has the "most significant relationship" to plaintiff's injury. McMillian, 253 S.E.2d at 662. Additionally, the court finds that under the principles of comity, Virginia has a compelling interest in applying its own laws to the allegedly tortious activity to which its citizens are subjected, especially in the case of Virginia voluntarily extraditing an individual to Texas for the prosecution of charges under Texas law. Willard v. Aetna Cas. & Sur. Co., 213 Va. 481, 483, 193 S.E.2d 776, 778 (1973).

## III.   CONSTITUTIONAL DEPRIVATION

Kovari alleges constitutional claims pursuant to 42 U.S.C. § 1983 claiming two violations of the Fourteenth Amendment: (1) unconstitutional conditions of confinement, and (2) denial of medical care. The court has already found defendants were state actors acting under the "color of law" for § 1983 purposes. ECF No. 36. Defendants are private companies performing an "exclusive government function," something that could not be done without authorization from the state. Lugar v. Edmondson Oil Co., 457 U.S. 922, 939 (1982); Correctional Servs. Corp. v. Malesko, 534 U.S. 61, 71 (2001) ("state prisoners already enjoy a right of action against private correctional providers under 42 U.S.C. § 1983"). Kovari must then show Brevard's policies or practices violated the constitutional minimum standard of care owed pretrial detainees and caused cognizable injury.

The protections of the Due Process Clause of the Fourteenth Amendment apply to pretrial detainees. Slade v. Hampton Roads Reg'l Jail, 407 F.3d 243, 250 (4th Cir. 2005). The constitutional protections guaranteed to a pretrial detainee under the Fourteenth Amendment "are co-extensive with those provided to convicted prisoners by the Eighth Amendment."

Christopher v. Warden Assistant Warden of Baltimore City Det. Ctr., No. CIV.A. JFM-13-1057, 2013 WL 1701464, at *1 (D. Md. Apr. 17, 2013) (citing Bell v. Wolfish 441 U.S. 520, 535 (1979)); see also Patten v. Nichols, 274 F.3d 829, 834 (4th Cir. 2001) (noting that "the Fourteenth Amendment rights of pre-trial detainees 'are at least as great as the Eighth Amendment protections available to a convicted prisoner.'") (quoting City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244 (1983)). Therefore, conditions of confinement for pretrial detainees cannot violate the Eighth Amendment protection against "cruel and unusual punishments." Sleeper v. City of Richmond Va., No. 3:12CV441-HEH, 2012 WL 3555412, at *6 (E.D. Va. Aug. 16, 2012). Additionally, "[t]he Fourteenth Amendment right of pretrial detainees, like the Eighth Amendment right of convicted prisoners, requires that government officials not be deliberately indifferent to any serious medical needs of the detainee." Dykes v. Inmate Servs. Corp., No. 9:14-CV-3609-RMG-MGB, 2017 WL 9286983, at *25 (D.S.C. Jan. 23, 2017), report and recommendation adopted, No. CV 9:14-3609-RMG, 2017 WL 496065 (D.S.C. Feb. 7, 2017). (citing Belcher v. Oliver, 898 F.2d 32, 34 (4th Cir. 1990) (citations omitted)). Both claims are addressed in turn below.

## A. CONDITIONS OF CONFINEMENT

Brevard seeks summary judgment on the conditions of confinement claim alleging that Kovari cannot demonstrate a genuine dispute of material fact that he suffered a serious injury, that Brevard maintains policies or customs maintaining unconstitutional conditions of confinement, that Brevard failed to train employees, and that any such conditions or training caused Kovari's injury. ECF No. 177.

Kovari argues that the transport subjected him to conditions of confinement that were cruel and unusual. Whether an inmate's conditions of confinement amount to "cruel and unusual punishment" must be measured against "the evolving standards of decency that mark the progress of a maturing society." Estelle v. Gamble, 429 U.S. 97, 102 (1976) (quoting Trop v. Dulles, 356 U.S. 86, 101 (1958)). In its Fourteenth Amendment analysis, this Circuit applies a two-prong test, considering: (1) "whether the conditions of confinement objectively inflict harm that is sufficiently serious to deprive a prisoner of minimal civilized necessities," and (2) "whether prison officials subjectively acted with 'deliberate indifference to inmate health or safety,' meaning that they actually knew of and disregarded the inhumane nature of confinement." Sleeper, 2012 WL 3555412, at *6 (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994)); see also Roberts v. Taniguchi, No. CIV.A. JKB-12-1187, 2012 WL 5252288, at *5 (D. Md. Oct. 23, 2012) (describing two-prong test). The first prong is an objective inquiry, while the second is subjective.

Brevard claims Kovari cannot satisfy the objective prong by showing that the deprivation was sufficiently serious. "To be 'sufficiently serious,' the deprivation must be 'extreme'—meaning that it poses a 'serious or significant physical or emotional injury resulting from the challenged conditions,' or 'a substantial risk of serious harm resulting from ... exposure to the challenged conditions.'" Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016) (quoting De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003)). This can include a failure "to furnish humane conditions of confinement, including provision of adequate food, clothing, shelter, and medical care." Sleeper, 2012 WL 3555412, at *6 (citing Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)). Brevard specifically challenges Kovari's ability to

demonstrate injury that is "more than de minimis." Robles v. Prince George's Cty. Maryland, 302 F.3d 262, 269 (4th Cir. 2002). Specifically, it argues that Kovari's allegations that the transport caused his high blood pressure fail the objective prong as a matter of law.

However, the court finds that Kovari presents sufficient evidence from which a jury could be persuaded that he was denied "a basic human need" during the course of his transport. De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003). First, Kovari contends that, taking his factual allegations as true, spending the better part of two weeks in a cramped "cage," amidst human waste, in the back of a hot van, driving erratically, with few breaks, for up to several days at a time, constitutes inhumane conditions. "That a totality of prison conditions can be combined to show an Eighth Amendment violation is a proposition established in many cases." Williams v. Griffin, 952 F.2d 820, 825 (4th Cir. 1991). The Fourth Circuit and several district courts have found similar conditions sufficient to satisfy the objective prong. See, e.g., Webb v. Deboo, 423 F. App'x. 299, 301 (4th Cir. Apr. 15, 2011) (finding "severe overcrowding was causing unsanitary conditions, the spread of disease, an increased risk of violence, and lack of access to medical care" in violation of Eighth Amendment); Griffin, 952 F.2d at 825 (finding a jury could infer harm from evidence of "severe overcrowding combined with other deficiencies in prison conditions" capable of causing psychological injury); see also Clark v. Daddysman, No. TDC-16-0921, 2018 WL 1453333, at *10 (D. Md. Mar. 22, 2018) ("leaving a prisoner in a cell containing human waste is sufficiently dangerous to an inmate's health and safety as to satisfy the objective prong" of a confinement inquiry); Fletcher v. Dykes, No. TDC-17-0914, 2018 WL 3785143, at *7 (D. Md. Aug. 9, 2018) (recognizing constitutional injuries based on photographs and testimony

showing deprivation of mattress, mirror, clothing, and soap, as well as exposure to extreme temperatures); Pellum v. Burtt, No. 9:05-3339-JFA-GCK, 2008 WL 759084, at *3 (D.S.C. Mar. 20, 2008) (recognizing constitutional injuries due to "five-day stay" in a cell without a sleeping mat or blanket, "proper ventilation," control of the lights, or access to hygiene items, and where plaintiff "was forced to use a styrofoam cup to relieve himself during the night"); Brown v. Mitchell, 327 F. Supp. 2d 615, 631 (E.D. Va. 2004) ("[A] reasonable jury could . . . conclude that the overcrowded, poorly ventilated, and dilapidated conditions at the Jail deprived inmates of one or more of those basic human needs.").

Brevard also argues that Kovari is unable to demonstrate a sufficiently serious injury because the pain to his wrists, rashes, dizziness, and high blood pressure were temporary. ECF No. 177, at 24. In doing so, it misconstrues the constitutional inquiry to require a showing of actual harm, when courts have found risk of serious harm to satisfy the objective prong. Kovari "need not show that [he] in fact suffered serious harm to prevail on this prong because the [Constitution] protects against future harm. Courts have plainly recognized that a remedy for unsafe conditions need not await a tragic event." Thompson v. Virginia, 878 F.3d 89, 107 (4th Cir. 2017) (internal quotation marks omitted). Kovari has demonstrated that he had been diagnosed with underlying medical conditions, including hypertension, prediabetes, and obesity; had previously suffered from cardiac complications; and was ultimately hospitalized upon arrival in Houston for his elevated blood pressure. He also asserts he remains traumatized from the experience, the sight of white vans causes him severe anxiety, and that he has difficulty sleeping. The court finds a reasonable jury could find either the existence of serious harm or the substantial risk that Kovari could have suffered serious harm.

Brevard also argues that Kovari's claims fail to demonstrate causation. First, it claims that Kovari's hypertension and sleep difficulties preceded the transport, and therefore cannot have been caused by the transport. Second, it claims Dr. Vassallo's testimony fails to unequivocally draw a causal relationship between the conditions of the transport and Kovari's hospitalization in Houston. ECF No. 177, at 20. The court finds exacerbation of an underlying condition can constitute a cognizable injury and that a reasonable jury could find causation based on Dr. Vassallo's testimony. Vassallo Dep., ECF No. 175-15, at 49:3-7 ("The effect of being held under those conditions on his blood pressure, under those stressful conditions on the blood pressure – what we know about blood pressure and stress is that stress increases blood pressure."); Id. at 63:21-65:21 ("And pain and heat, known cardiovascular disease, atherosclerosis, high blood pressure, prediabetes are all risk…So the answer is that, when you are held in those kinds of conditions, it puts you at substantial risk of serious harm because you might have an elevation in your blood pressure for those days. You might have a myocardial infraction."). Dr. Vassallo's testimony also responds to Brevard's contention that Kovari contributed to his own risk of future harm by noncompliance with his prescribed medication regime by saying that highly stressful situations, such as the transport, "may put him at more risk of a heart attack than two years of being intermittently compliant or noncompliant." Id. at 65:6-13. Even if Kovari's alleged injuries are not found to rise to the level of serious harm, Dr. Vassallo's testimony creates a genuine dispute about the risk of harm. She testifies that patients with hypertension who are denied their medication risk strokes, cardiac arrest, or death. Vassallo Rep., ECF No. 194-9, at 9. Whether the actual harm or the risk of future harm is "substantial" is a question of fact for the jury, but the court finds

a genuine dispute of material fact as to the existence of constitutional injury. De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003).

Brevard also argues that Kovari fails to establish deliberate indifference under the subjective prong. The court must assess whether Brevard subjectively acted with "'deliberate indifference to inmate health or safety,' meaning that they actually knew of and disregarded the inhumane nature of the confinement." Scinto, 841 F.3d at 225 (4th Cir. 2016) (quoting Farmer, 511 U.S. at 837). Deliberate indifference is "more than mere negligence," but "less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result." Id. "An obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmate." Porter v. Clarke, 923 F.3d 348, 361 (4th Cir. 2019), as amended (May 6, 2019) (quoting Schaub v. VonWald, 638 F.3d 905, 915 (8th Cir. 2011)). Brevard claims that transport employees did not know of Kovari's medical conditions and that Kovari never appraised them of his medical needs, therefore Brevard cannot be found to be deliberately indifferent. However, Kovari has presented evidence sufficient to create a factual dispute as to the transport employees' actual knowledge. He points to medical records from Northwest Regional which support his claims that he did communicate his medical history, that he was referred for further medical screening, and that he was prescribed medicine. A jury can reasonably infer from evidence that Kovari clearly communicated his conditions to staff at Northwest Regional that he would also have clearly communicated his medical needs to staff from Brevard. Kovari also introduces Brevard's own documentation from his pickup which reflect that he was picked up with prescription medicine. Further, Kovari suggests that his morbid obesity and allegedly repeated

41

complaints of pain and dizziness during the transport were sufficient to put defendants on notice of the serious risk to his wellbeing. Kovari's medical records along with his testimony create a genuine dispute as to whether transport employees subjectively knew of his medical risks, or that the risks were so obvious that they should have known.

After showing an underlying constitutional violation, Kovari must also show an unconstitutional custom or practice to prevail on a <u>Monell</u> claim. These "may be found in 'persistent and widespread ... practices of ... officials [which,] [a]lthough not authorized by written law, [are] so permanent and well-settled as to [have] the force of law.'" <u>Spell v. McDaniel</u>, 824 F.2d 1380, 1386 (4th Cir. 1987) (quoting <u>Monell</u>, 436 U.S. at 691 (citations omitted)). A constitutional policy on the books does not insulate the entity from liability for unconstitutional customs or practices. <u>Doe ex rel. Lopez v. Shenandoah Valley Juvenile Ctr. Comm'n</u>, 355 F. Supp. 3d 454, 466 (W.D. Va. 2018). <u>See also</u>, <u>Marriott v. Cty. of Montgomery</u>, 426 F. Supp. 2d 1, 9 (N.D.N.Y. 2006) ("Constitutional words cannot erase unconstitutional conduct"). In addition to proving the existence of unconstitutional policy or practice, Kovari must prove causation, by showing that policy is (1) fairly attributable to the municipality [or entity] as its 'own,' ... and is (2) the 'moving force' behind the particular constitutional violation." <u>Spell</u>, 824 F.2d at 1387 (citations omitted). To establish attribution, a plaintiff can show either that "duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the [body] that the practices have become customary among its employees,…[or that the entity's] policymaker has actual or constructive knowledge of such a course of customary practices among employees subject to the policymaker's delegated responsibility for oversight and supervision ...." <u>Id.</u> at 1387. An entity is liable if they have

42

knowledge of the policy or custom, whether actual or constructive, and "their failure, as a matter of specific intent or deliberate indifference, thereafter to correct or stop the practices." Id. at 1391. See also Wright v. Town of Glenarden, No. 95-2580, 1996 WL 350009, at *3 (4th Cir. June 26, 1996). Finally, "[a] sufficiently close causal link between such a known but uncorrected custom or usage and a specific violation is established if occurrence of the specific violation was made reasonably probable by permitted continuation of the custom." Spell, 824 F.2d at 1391.

Brevard claims that Kovari alleges no evidence of an unconstitutional written policy and no more than a few isolated instances of unconstitutional conduct insufficiently pervasive to constitute a custom. ECF No. 177, at 22-23. For his part, Kovari states that he alleges unconstitutional written policies, customs, and training. ECF No. 193, at 30. Specifically, Kovari points to Brevard's written Manual that permits the vehicle to drive for up to six days nonstop as long as the van is equipped with a sleeping berth for the drivers, but not the passengers, and that it permits overcrowded "cages" through high maximum occupant restrictions. He also identifies Brevard's business model, charging per prisoner per mile, as an unconstitutional written policy encouraging circuitous routes to charge for as many passengers as possible, driving through the night to maximize mileage per day, and operating without pre-planned routes to allow for flexibility to pick up more passengers. To demonstrate unconstitutional custom, Kovari also presents sworn statements from Brevard employees as well as internal communications at the company that recall erratic driving, urination into water bottles, dismissed medical complaints from passengers, and express orders not to take

43

passengers to the hospital. The evidence is sufficient to create a genuine factual dispute from which a jury might find that Brevard did maintain unconstitutional policies and customs.

Finally, Kovari points to deficient training and omissions in rectifying problematic practices to support his Monell claim. "[W]hen [entities] are on actual or constructive notice that a particular omission in their training program causes [its] employees to violate citizens' constitutional rights, the [entity] may be deemed deliberately indifferent if [it] choose to retain that program." Connick v. Thompson, 563 U.S. 51, 61 (2011). Kovari claims that Brevard's training, or lack thereof, contributes to the constitutional injury he experienced because transport employees are not taught how to assess a passenger's fitness to travel or how to respond to medical complaints during the course of multiday transports. He also claims that Brevard's lack of policies addressing the substantial risk of physical harm from transports contributes to the Monell violation. He points to a litany of lawsuits against Brevard challenging injuries arising out of these conditions as putting the entity on notice, and that "long-standing failure to act in the face of the known conditions" constitutes deliberate indifference. Brown v. Mitchell, 327 F. Supp. 2d 615, 631 (E.D. Va. 2004); see also Washington v. McAuliffe, No. 7:16-cv-00476, 2018 WL 401903, at *8 (W.D. Va. Jan. 12, 2018) (explaining that liability attaches where there is "continued inaction in the face of documented widespread abuses" (citation omitted)).

Whether Kovari raises sufficiently egregious and unjustifiable policies or practices contributing to unconstitutional conditions of confinement is a question for the jury. But the court finds factual disputes regarding the existence of unconstitutional polices and practices forecloses summary judgment at this stage. Brevard's motion as to this claim is **DENIED.**

## B.  DEPRIVATON OF MEDICAL CARE

Brevard also challenges Kovari's deprivation of medical care claim, raising arguments substantially similar to those raised against the conditions of confinement claim. Namely, Brevard argues that Kovari is unable to establish a sufficiently serious medical need and cannot demonstrate Brevard's deliberate indifference. ECF No. 177, at 25.

A Fourteenth Amendment claim of deprivation of medical care requires a showing that the plaintiff had a serious medical need for treatment and that the defendant officials acted with deliberate indifference to that need—that they knew of the need, knew that it presented a serious risk of harm if not addressed, and failed to respond reasonably to the risk. Estelle v. Gamble, 429 U.S. 97, 104–05 (1976) ("deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain"); Sever v. CEO of Prisoner Transp. Servs., No. 7:10CV00406, 2010 WL 4824682, at *3 (W.D. Va. Nov. 22, 2010), aff'd sub nom. Sever v. CEO of Prisoner Transp. Am., 421 F. App'x 302 (4th Cir. 2011). This requires that Kovari show an objectively serious condition, subjective awareness by defendants of the need and a failure to provide reasonable care in light of the circumstances. See Farmer v. Brennan, 511 U.S. 825, 837 (1994).

Objectively, the medical condition must be serious. See Hudson v. McMillian, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). The court finds Kovari's diagnoses of hypertension, prediabetes, morbid obesity, and

cardiovascular disease by a medical professional to satisfy this element.  Indeed, Kovari was

prescribed two daily medications to control his hypertension, which, on his version of the

facts, he was again provided by Northwest Regional during his time there, and the Houston

physicians following his hospitalizations. Scinto, 841 F.3d at 228–29 (finding the underlying

condition of insulin-dependent diabetes to be objectively serious when diagnosed by a

professional and treated by daily medication). In demonstrating the severity of this deprivation,

Kovari points to his hospitalization and the increase in his blood pressure following the

transport. Id. ("[T]here are genuine disputes of material fact as to whether…this increase is

itself a serious injury"). Kovari's version of the facts indicates Brevard employees withheld

medication he needed and was prescribed by a physician, which a jury could find constitutes

serious harm. Id. The court finds this creates a factual dispute as to whether the underlying

conditions are severe and whether his need for medical care was dire.

   As with the conditions of confinement claim, Brevard claims that Kovari is unable to

show deliberate indifference to his medical needs. This subjective element first requires a

showing that defendant recognized a substantial risk of harm. Parrish v. Cleveland, 372 F.3d

294, 303 (4th Cir. 2004) ("[T]hey actually must have perceived the risk") (citation omitted);

Oladokun v. Maryland, No. CIV.A. DKC-14-463, 2014 WL 7014511, at *9 (D. Md. Dec. 10,

2014) (citing Rich v. Bruce, 129 F.3d 336, 340 n. 2 (4th Cir.1997). The factual dispute central

to this case concerns whether Brevard's transport officers knew about Kovari's medical

conditions, the prescriptions he was required to take, and his increased pain and discomfort

during the transport. As discussed above, the medical records from Northwest Regional as

well as Brevard's intake documentation are pieces of evidence that can show the transport

drivers knew about Kovari's prescriptions. The fact that Kovari thoroughly recounted his medical history to Northwest Regional staff, as evidenced by the booking form, supports his claim that he was equally forthcoming with Brevard's staff. Further, his testimony as well as the statements of other passengers and some drivers on board the van indicate he complained regularly, which can either demonstrate constructive notice as to an underlying medical cause for complaint or actual notice as to pain warranting immediate medical care. A reasonable jury could infer from this evidence that the drivers had actual or constructive knowledge of Kovari's medical needs.

Then, under the deliberate indifference prong, Kovari must show Brevard recognized its response was inappropriate in light of that risk. This standard is more than "mere negligence or even civil recklessness." Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014). "A health care provider may be deliberately indifferent when the treatment provided is so grossly incompetent, inadequate, or excessive as to shock the conscience or is intolerable to fundamental fairness." Parker v. Quinones, No. 7:11-CV-00548, 2012 WL 4615057, at *2 (W.D. Va. Oct. 2, 2012) (citing Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir.1990)). The parties at hand do not dispute that Brevard did not provide medication, did not offer medical care, and did not consult a medical professional at any point during the transport. Should a jury find Kovari's evidence of a serious medical need and Brevard's awareness of it compelling, then the denial of prescribed medication could constitute deliberate indifference. See Scinto, 841 F.3d at 228–29 (finding the denial of insulin to a diabetic deliberate indifference).

Finally, Brevard again argues that summary judgment is proper because, even if Kovari is able to show unconstitutional deprivation of medical care, he is unable to point to policies

or customs fairly attributable to the private prison transport company that caused the violation. Here, Kovari posits that Brevard maintains de facto policies not to include a medical professional or medical equipment on the transport, to dismiss passenger complaints of pain as "ruses," and to avoid taking passengers to hospitals at all costs. He also reasserts policies and customs discussed in the conditions of confinement claim as practices propagated in deliberate indifference of the risk they pose to passenger health, such as limited restroom breaks, multi-day legs of the journey without a night to sleep, inadequate hygiene, and insufficient provisions of food and water. Finally, and of particular import to this claim, Kovari presents evidence of Brevard's agent training curriculum to support his allegations that the medical training is rudimentary at best. He argues that the deficient training is a policy that recklessly permits transport officers to intake passengers when they are unqualified to evaluate individual fitness for travel and untrained to respond to medical emergencies that arise along the way. Kovari argues that an entity which knows passengers may be in their custody for days in stressful conditions but does not plan and prepare for medical contingencies is deliberately indifferent to the risk of harm. Kovari also presents the expert testimony of a former employee of the U.S. Marshals Service whose testimony supports the proposition that reasonable transport standards require employees to be trained to respond to medical needs. A jury could find, based on the totality of evidence proffered, Brevard's policies unconstitutional.

In sum, Kovari's constitutional claims are replete with factual disputes that defeat Brevard's motion for summary judgment.

## IV.   TORT CLAIMS

Brevard challenges each of Kovari's tort claims as a matter of law. Regarding the claim of negligence and gross negligence, Brevard claims that Kovari fails to establish it was owed a duty by the private prison transport company. ECF No. 177, at 30-31. Further, Brevard claims Kovari cannot demonstrate compensable injury justifying an award of damages. Id. at 31. As to the intentional affliction of emotional harm claim, Brevard claims a separate cause of action for emotional damages based on the same set of facts giving rise to his claim for physical damages is inappropriate. Id. at 32-33. Further, it claims Kovari's emotional damages are not cognizable under the law. Id. at 33-34.

### A.   NEGLIGENCE AND GROSS NEGLIGENCE

Central to both negligence and gross negligence is the existence of a duty of care owed by defendant to plaintiff. "The elements of an action in negligence are a legal duty on the part of the defendant, breach of that duty, and a showing that such breach was the proximate cause of injury, resulting in damage to the plaintiff." Blue Ridge Service Corp. of Va. v. Saxon Shoes, Inc., 271 Va. 206, 218, 624 S.E.2d 55, 62 (2006) (citing Trimyer v. Norfolk Tallow Co., 192 Va. 776, 780, 66 S.E.2d 441, 443 (1951)). To state a claim for gross negligence, Kovari must allege that the defendant engaged in conduct that exhibited "the utter disregard of prudence amounting to complete neglect of the safety of another." Volpe v. City of Lexington, 281 Va. 630, 639, 708 S.E.2d 824, 828 (2011); see also City of Lynchburg v. Brown, 270 Va. 166, 613 S.E.2d 407, 410 (2005) (Gross negligence "is a heedless and palpable violation of legal duty respecting the rights of others. It is want of even scant care and amounts to the absence of slight diligence.") (internal citation and quotation marks omitted). Absent some external legal or relationship-based requirement, individuals owe each other only "the degree

of care an ordinarily prudent person would use in a similar situation to avoid injury to another."
Cowan v. Hospice Support Care, Inc., 268 Va. 482, 486, 603 S.E.2d 916, 918 (2004).

Contrary to Brevard's assertions, a prison transport entity does owe its charges a duty of care beyond ordinary care owed anyone. Virginia law regularly recognizes the special duty owed by one who exercises total dominion over another. See Quisenberry v. Huntington Ingalls Inc., 296 Va. 233, 247, 818 S.E.2d 805, 812 (2018) (discussing duty to use ordinary care and skill to avoid such injury when entrusted with care of another); Adams v. NaphCare, Inc., 244 F. Supp. 3d 546, 551 (E.D. Va 2017) (denying dismissal of negligence claim brought by a pretrial detainee, which the defendant sought based on a purported lack of duty of care, and finding that a prison administrator "owed a duty to [the detainee] to see that he was provided quality and appropriate medical care"); Reid v. Newton, No. 3:13-CV-572, 2014 WL 1493569, at *14 (E.D. Va. Apr. 14, 2014) (finding intake staff at facility owed special duty to detainee "who was under the care and control of the Jail and its employees"). Virginia extends the special duties owed a detainee to private entities as well. See, e.g., Dudley v. Offender Aid & Restoration, Inc. ., 241 Va. 270, 401 S.E.2d 878, 881 (Va.1991) (finding a half-way house could be liable for its negligence where it "undertook a responsibility for very close and continuous supervision of its inmates"); Fox v. Custis, 236 Va. 69, 372 S.E.2d 373 (1988). Brevard owed its passengers, including Kovari, a duty of care proportional to its exercise of dominion.

Brevard provides no legal citations to support its argument that Kovari has not demonstrated a compensable injury, and the court finds no such grounds exist. Brevard contends that to establish injury, Kovari must present expert testimony as to damages, and that his expert, Dr. Susi Vassallo cannot establish causation for negligence. However, this is

not an appropriate issue for the court to determine as a matter of law. <u>Heckenlaible v. Virginia Peninsula Reg'l Jail Auth.</u>, 491 F. Supp. 2d 544, 555 (E.D. Va. 2007). "Negligence is ordinarily a jury issue." <u>Id.</u> "Only when reasonable minds could not differ does the issue become one of law to be decided by a court." <u>Artrip v. E.E. Berry Equip. Co.</u>, 240 Va. 354, 357, 397 S.E.2d 821, 823 (1990); <u>see</u> <u>Atrium Unit Owners</u>, 266 Va. at 294, 585 S.E.2d at 548 (explaining that proximate causation "is generally a question of fact to be resolved by a jury"). Kovari has met the bar to put the fact of injury and causation in dispute; at a minimum, he was hospitalized at the end of his transport. The extent to which this injury is compensable and attributable to defendant's breach is in the province of the jury.

## B.   INTENTIONAL INFLICTION OF EMOTIONAL HARM

Brevard argues that intentional infliction of emotional harm is an inappropriate claim to bring in this case because to do so would conflate Kovari's physical damages with emotional damages. ECF No. 177, at 32. Under Virginia law, the general rule in tort cases is "that, absent proof of physical injury or wanton or willful conduct, there can be no recovery of damages for mental anguish, emotional distress, or humiliation." <u>Sea–Land Serv., Inc. v. O'Neal</u>, 224 <u>Va.</u> 343, 354, 297 S.E.2d 647, 653 (1982). However, in cases involving intentional torts, recovery of damages for emotional suffering, such as humiliation and embarrassment, is permissible. <u>Id.</u> Virginia law in no way restricts the applicability of intentional infliction of emotional harm to nontactile conduct, nor does it proscribe allegations of emotional harm for conduct giving rise to allegations for physical harm. <u>Morrison v. Jordan</u>, No. CIV.A 7:08-CV-00643, 2009 WL 4363922, at *7 (W.D. Va. Dec. 1, 2009) (considering an intentional infliction

of emotional harm claim in conjunction with an excessive force claim, both arising out of a physical altercation between a detainee and correctional officers).

Brevard correctly states that actions for intentional infliction of emotional distress are not favored in Virginia. Harris v. Kreutzer, 271 Va. 188, 204, 624 S.E.2d 24, 33 (2006). The Supreme Court of Virginia established that a plaintiff cannot recover on an intentional infliction of emotional distress claim unless he can show by clear and convincing evidence that "1) the wrongdoer's conduct was intentional or reckless; 2) the conduct was outrageous or intolerable; 3) there was a causal connection between the wrongdoer's conduct and the resulting emotional distress; and 4) the resulting emotional distress was severe." Supervalu, Inc. v. Johnson, 276 Va. 356, 370, 666 S.E.2d 335, 343 (2008) (citing Almy v. Grisham, 273 Va. 68, 77, 639 S.E.2d 182, 186 (2007); Womack v. Eldridge, 215 Va. 338, 342, 210 S.E.2d 145, 148 (1974)). Liability "arises only when the emotional distress is extreme, and only where the distress inflicted is so severe that no reasonable person could be expected to endure it." Russo v. White, 241 Va. 23, 27, 400 S.E.2d 160, 163 (1991).

The court finds that Kovari does not create a factual dispute about severe emotional harm sufficient to survive a summary judgment motion. That Kovari suffered during the transport and perhaps continues to experience anxiety may be. However, he does not present any evidence to support his averments of difficulty sleeping, extreme anxiety, and persisting emotional trauma beyond his own testimony. In Russo, the court found plaintiff's complaints that "she was nervous, could not sleep, experienced stress and 'its physical symptoms,' withdrew from activities, and was unable to concentrate at work" to be insufficiently severe. Russo, 241 Va. at 28. "There is no claim, for example, that she had any objective physical

injury caused by the stress, that she sought medical attention, that she was confined at home or in a hospital, or that she lost income." Kovari has not provided evidence corroborating emotional harm, beyond his conclusory testimony, and indeed has not sought medical help for his alleged mental health issues. Kovari distinguishes <u>Russo</u> as involving nontactile conduct, thereby imposing a higher bar. However, <u>Morrison</u> involved tactile conduct resulting in "a laceration, concussion, momentary unconsciousness, and, most notably, cracked ribs," yet the court dismissed Morrison's claims of intentional infliction of emotional stress, finding he did not sufficiently allege emotional harm. <u>Morrison v. Jordan</u>, No. CIV.A 7:08-CV-00643, 2009 WL 4363922, at *5 (W.D. Va. Dec. 1, 2009). The bar at summary judgment is higher than the one at motion to dismiss, and Kovari fails to carry his burden of demonstrating severe emotional harm with clear and convincing evidence.

Accordingly, the court grants Brevard's motion for summary judgment as to Kovari's intentional infliction of emotional harm claim.

## V.   DECLARATORY JUDGMENT

Brevard asserts that it is entitled to summary judgment on the issue of declaratory relief because Kovari has been released from defendants' custody and the issue is therefore moot. ECF No. 177, at 35. Kovari does not contest this and indeed confirmed he will not seek declaratory relief if he prevails in this case. ECF No. 193, at 40. "To be justiciable under Article III of the Constitution, the conflict between the litigants must present a 'case or controversy' both at the time the lawsuit is filed and at the time it is decided. If intervening factual ... events effectively dispel the case or controversy during pendency of the suit, the federal courts are powerless to decide the questions presented." <u>Ross v. Reed</u>, 719 F.2d 689, 694 (4th Cir.1983).

When an inmate is dismissed from a prison system, "there is no longer a 'substantial controversy' between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of [injunctive or] declaratory relief." See Inmates v. Owens, 561 F.2d 560, 562 (4th Cir.1977) (citing Golden v. Zwickler, 394 U.S. 103, 108 (1969)); see also Ross, 719 F.2d at 694. All charges were dropped against Kovari, which "rendered moot [his] claims for injunctive and declaratory relief, since he is unlikely to return to [the prison]." Williams v. Griffin, 952 F.2d 820, 823 (4th Cir.1991); Magee v. Waters, 810 F.2d 451, 452 (4th Cir.1987). Kovari's case is not mooted in its entirety, because he seeks monetary compensation. Williams, 952 F.2d at 823.

Accordingly, the court **GRANTS** Brevard summary judgment on the issue of declaratory and injunctive relief.

## VI.

For the foregoing reasons, the court **DENIES** Brevard's motions for summary judgment as to all constitutional claims, finding genuine disputes of material facts for the jury to resolve. The court **DENIES** Brevard's motions for summary judgment on the state law claims of negligence and gross negligence, but **GRANTS** summary judgment in favor of Brevard on the intentional infliction of emotional damages claim, finding insufficient evidence of severe emotional harm. Given that Kovari is no longer in federal, state, local, or private prison custody, the court finds no active case or controversy and **GRANTS** Brevard's motion for summary judgment as to declaratory relief.

Additionally, the court **DENIES** Brevard's motion to preclude the testimony of Dr. Vassallo. The court **GRANTS in part** and **DENIES in part** Brevard's motion to exclude the

54

testimony of Eric L. Clark and Kovari's motion to exclude the testimony of Charles Hildebrand.

     An appropriate Order will be entered.

               Entered: May 18, 2020

               Digitally signed by Michael F. Urbanski
               DN: cn=Michael F. Urbanski, o=Western District
               of Virginia, ou=United States District Court,
               email=mikeu@vawd.uscourts.gov, c=US
               Date: 2020.05.18 18:39:11 -04'00'

               Michael F. Urbanski
               Chief United States District Judge